The Court has a preliminary question for counsel before we get started. We've got Mr. Angel for appellants, and Mr. Angel for appellants, and Mr. Schramm for appellants. And the preliminary question that's in the mind of the Court is that we see we have the same counsel arguing D'Angelo and the Crofts case. This case was set for 10 minutes per side, and the other case was set for 20 minutes per side. We're just wondering if it might be possible to shorten up the timing on these because we have the same counsel and a great deal of overlap. But we didn't want to tell you all of a sudden that we were combining the two arguments because you may have already structured your arguments in your prep to have them separate or to take 20 minutes. So we don't want to be unfair to you, but we are wondering if anything can be shortened up because of the coincidence of the same lawyers. Your Honor, we just talked about this very fact during the break, and I think it's our opinion that if, in fact, you want to consolidate them for purposes of oral argument only, we could do that. That would be fine with us. I think the court would probably be able to grasp the issues more coherently that way, too. Well, you know, Montana counsel are so sharp they never get confused by anything. What we'll say is why don't we let you each take 20 minutes per side for both cases together and see if that works. And of course, if you don't need all that time, you don't have to use it. We'll cover both cases together. And I guess we'd better start with appellant's counsel first as is traditional. Thank you, Your Honor. Thank you, Judge Berzon, Judge Gould. And wait one second, Stacy. Put the time at 20 minutes. Thank you. Judge Sforza, my name is Jeffrey Angel. I'm an attorney from Bozeman, Montana. And some well-established laws don't make themselves or get a foothold in Montana very quickly. In this case, the officials in charge are filling the state coffers with a group of second-class citizens. These are people that are Montana residents for all purposes except in the eyes of the institution. This is a practice that was carried out by a small number of individuals. And they publish such things as once classified as a nonresident, the student retains that status for the three years of law study. Now, this is an irrebuttable presumption that you are not and never will be a resident of Montana. Well, for purpose of this argument, don't we all assume that there is a constitutional violation and go on from there? That's the underlying assumption at this stage. Yes, the court did not reject the notion in light of that overwhelming evidence. We don't need to argue about whether it's constitutional or not. Correct. It is important to point out the types of violations because the court in Young did reject that the parties had Article III standing, that they were affected by the individual defendants. In that regard, and this is in the D'Angelo case, Defendant Cross wrote a letter to Mr. Gibson, one of the plaintiffs, on January 28th of 1999. And he said that the waiting period does not run for any period of time for which you have enrolled for seven or more credits. Now, he wrote that to Mr. Gibson on January 28th of 1990. The lawsuit was filed on January 25th of 2002, less than three years later. The statute of limitations in Montana for personal injuries is three years. Despite that Mr. Gibson a defendant in one of these cases? Mr. Cross, the author, is a defendant in both cases. He is a defendant because his action from 19 January 1st or July 1st of 1996, he continued the job of the Commissioner of Higher Education. He did not promulgate the enforcement of the policy which is constitutional on his face. But he did continually, and this shows even through his own handwriting, he was telling people in writing. He was directing his subordinates to apply this rule as an irrebuttable presumption. He was the Executive Secretary of the Board of Regents. He was assigned the task to implement. I'm wrong. It's my understanding from I think the affidavit Gibson filed that he was first denied residency standard standing in 1947, 97. That's in his affidavit. First denied that, correct. That was the original denial. Correct. And what the Court did here, it's an interesting. The statute of limitations would run from that time. That's what the Court applied. They said from the day you start school, whether you go to school for three years, four years or ten years. I'm not talking about when they started school. I'm talking about the time when the decision was made to deny him residency standard. And that was according to his affidavit in 1997. He, and this is Gibson. Gibson. That's the first time he applied, and he continued that application. You're not answering the question. Yes. Is it correct that in 1997, the denial was made for the first time? That was the first semester. First time. Yes. You're arguing that there's some kind of a continuing violation. Well, my argument, I think, meets the facts on even keel. Each semester these students went to school. I mean, Box is a good example. She never applied formally for a change in her residency status. And the reason she never applied is because she got the application that you would use, and it says you cannot count any time when you are going six or more than six credits. She talked to people, and we get these statements. Who are you talking about now? That was Megan Box. She never made any formal application, and, of course, you don't have to apply to be a victim. This process and this defendant, Richard Crofts, disseminated this in all branches of this university system to make sure there wouldn't be applications. He ---- But is your contention with regard to Gibson, for example, that there were continuing violations because he put and would have applied asserting different facts later on or because the decision continued to impact him? I mean, there's a difference. And if he ---- once he applied and was rejected, unless he was going to tell them something else the second time he applied or could have had residency the second year, although he ---- even if he didn't the first, it seems to me that there was a decision and it was final and there was no reason to view it as a continuing violation. It is the plaintiff's position that each semester their facts are changed. Each semester a new catalog comes out reinforcing you can't apply and you cannot appeal. Each semester they tell people that try to that this policy is set in stone and there is no discretion. And each semester the student pays that out-of-state tuition based on their circumstances and those publications, billing, and this irrebuttable presumption created by the university. Each semester occurs ---- So the facts ---- if the facts change, it's not relevant based on your position because you say there was a categorical policy that they would not grant residency stand. Yes, and I think Megan Box is somebody who was probably most like all students, somebody that went there and would periodically get the publications and read those and find out, I'm still not going to be able to do this, I'm going to school. That is typical. We have, well, when ---- let me make sure I get this name right, given that we're dealing ---- when Quincy Young applied, she was told by the president, George Dennison of the university, that she, quote, satisfied all the requirements during the 12-month residency period, except that she registered for more six credits per semester. They follow up in the ---- That was in 1994. That was what Quincy Young was told in 1994, correct. She continued to go to school through 1998, and each time, again, she was told that this residency policy, our determination of your in-state or out-of-state status cannot be challenged. You cannot qualify. You cannot go to school and apply that time towards becoming a resident. And Quincy Young did take action to try to challenge that until she concluded that all students, as far as we can tell, all students, even those that actually challenged this through this futile process, were constantly told. It's set in stone. There are no two ways about it. But I thought the record showed that there were some people who did get residency status under these circumstances. And if there's anything I can add by today's process, I want to make one thing clear. We are not challenging the initial classification. Every student, I believe, that we represent was properly excluded for at least a year. You remain an out-of-state student for at least a year. If you moved to Montana because you're with your parents and they're moving there, whatever the purpose of coming there is. I'm a little lost. I'm sorry. I didn't understand the answer to my question. Does the record not demonstrate that after that, some people who don't meet the sixth credit rule did get residency status? Not from the record I reviewed. I believe what that shows is people that were allowed in-state tuition because they just got it wrong the first time. And that's an allegation that's carried through the briefs and presented to the court, that we're complaining that the school here got it wrong the first time. We're not. We're not saying that the initial classification was incorrect. It was correct. They were people that had just moved to Montana, whether they moved there with their family and their husband and their house and kids, or whether they came there for school and then made it their home in years after that. It seems to me you're arguing the merits of your claim that this was an unconstitutional practice. But what exactly are you saying now as far as the appeal is concerned? What point are you making now? The court in D'Angelo v. Cross held that these defendants, and a good example of that is Gibson. We haven't answered the question. What is the point that you're making at this point? The statute didn't run and the court didn't run. So the question is when the decision was made and whether there's a continuing violation. And according to my view of the record, the decision was made more than three years before the filing of the lawsuit or either the lawsuits, except in the case of D'Angelo. Well, and Gibson, Gibson was pursuing that internal remedy. Well, you're assuming that when he was appealing his early denial that the statute didn't run, but that seems to me is contrary to the cases. Well, and I'm arguing that because he remained and continued to be a student, that they would publish new catalogs, send him out a new bill. He would review those and he would pay the bill, realizing that there was nothing he could do. Now, in the case of D'Angelo, she was told by her drama coach, I think, that there's no point in applying the categorical policy. But she never had any contact with any of the defendants, no communications, didn't get anything from them, didn't talk to them, didn't learn anything from them. So how does she have a claim for personal liability against these defendants? My recollection is Sarah D'Angelo did what all students do. They got the catalog. They read what these defendants. She got the catalog. And read what these defendants published in them. They publish it in the student newspaper, in the local town newspaper. They publish these statements very wide and make the policy very clear. And when you see it in the briefs and in the excerpts, you notice that the only thing placed in bold is those irrebuttable words creating an irrebuttable presumption. But what's the best case that you have for imposing personal liability for a constitutional violation on an employee under the circumstances as you've described them because the policy was published in the bulletin? I don't – well, I would answer that by saying we are not seeking to impose liability on the State. We – these individuals took this act. That's what I'm talking about, the individuals that you named. What basis do you have for imposing personal liability because they published catalogs? Well, Mr. Crofts, when he wrote the students and imposed that irrebuttable presumption with his own pen, when he approved and published the catalogs, was taking acts that on their face were unlawful. Those words are clearly words of an irrebuttable presumption. And they have routine meetings. And we have in the supplemental excerpts of record a letter from 1993 before his time where they talk about the purpose in telling people not to appeal, to stop appeals. So people won't – But I understand your point about the constitutional violation. I'm a little troubled at how Ms. DeAngelo can recover damages from Mr. Crofts because he was carrying out this policy when she never had any dealings with him. She never applied. She never was refused. She never talked to him. All she did was read the bulletin, apparently. Or was told by the drama coach, actually. Right. Told by the people, the subordinates, what they were told to pass on. And we know that because in the record – She wasn't told by any of the defendants. No. Richard Crofts didn't actually communicate other than the few letters we have directly with the students. He would tell the registrars and the people of authority in the different branches what to tell the students. I understand that, but none of the defendants communicated with DeAngelo. Correct. We are not trying to impose liability for their direct acts. It's the act of supervision, the act of implementation. And Crofts is the only person that supervised and implemented this policy. There isn't another person that did it. For that, he should be held liable. We're also – this case demonstrates a good point. He is not currently in power. He's not the commissioner of higher education. And with the delays, we will never be able to get this court, because it continues today, to tell somebody in that position to stop being the injunctive relief or the declaratory relief if we have to do it in such a narrow amount of time, window of time, that we can catch that person. Why didn't you bring an action for an injunction? Pardon? Why didn't you bring an injunction for – an action for injunctive relief against the trustees and the directors of the university? We did include a claim for injunction in this case and in the prior case against Crofts. But it is a little mystifying why this case has – I understand that people graduate from college and graduate school in a certain number of years, but there is lots of litigation like this that manages to get to merits determinations while the people are still in school. If the class action is certified early enough, then the fact that people graduate in the meanwhile doesn't matter. You can still get injunctive relief. It's a – in a very strange posture in terms of trying to get to the merits of the issue. We agree, and the parties have moved several times because of the association of the judges being donors and part of the system. But, I mean, as plaintiffs, we're powerless to address that situation. We've tried, and we tried by bringing a second lawsuit, and we still feel miffed. Did you ever make a motion for certification of a class as opposed to filing a class complaint? Yes. We have moved to have it certified twice. In a timely manner while people were still in school and before all the time had run and so on? Twice, when I believe the students – I have to think of a name. We made a – we made and renewed a motion for class certification in both cases and in – Before the individual people's claims were moved, however. Well, and I was going to say, in D'Angelo, I believe she was still in school at the time. She applied and began that and matriculated in the early 2000s. What relief are you looking for here? Pardon? So what relief are you now looking for? I think the first thing, being a victim myself when I was there in 95 to 98, to stop the practice. Montana's not – But you're not going to get that out of this lawsuit the way it's now structured except indirectly. So what directly are you asking the courts to do? Damages and some declaration that this can't be allowed because it persists. Even if it's against these defendants individually and they are no longer the commissioner and the board members, the message will be sent. Thank you. Okay. We'll hold some time for rebuttal. Thank you, Your Honor. My name is Leroy Schramm. I'm here on behalf of the University – Could you speak up a little and maybe – Pardon me. Yes, I'm sorry. You lift the mic up. Go ahead, Mr. Schramm. I think we heard today what we saw in the briefs, which is they did this, they did that, they published this, they published that. And that's not true if you actually go to the facts. The named plaintiffs didn't do anything, didn't do most of these things. And let's take Cross, for example. Are you talking about the named defendants? Yes. You said the named plaintiffs. Pardon me. Named defendants. I misstated. Cross, we heard, instructed registrars. The only evidence on the record that Cross instructed registrars was in the deposition of some employees of the registrar's office at the University of Montana. And they said, and also the deposition of the dean of the law school, all of them said they had never been instructed by anyone that this was, that this policy was to be interpreted other than as it's written, which is as a rebuttable presumption. There is a lot of language floating around in a lot of places from which one could certainly surmise otherwise.  There is language floating around, the law school catalog, for example, and said on its face once you're classified you remain the status. Well, that's actually true. You do remain in that status unless you ask for reclassification. And the truth is most students aren't reclassified. Most students do. And that was explained by the dean. I'm here to Mr. Gibson signed by Mr. Cross in January of 1999. It says that the 12-month period does not begin until acts indicative of an intent to establish residency are taken and does not run for any period of time for which you are enrolled for seven or more semester credits. Yes. And at his deposition, Mr. Cross was asked about that. And he said that was based on my analysis of Gibson's, the facts around Gibson's record or Gibson's admission. That is not a statement about the policy in every student. But certainly for present purposes, i.e., summary judgment purposes, somebody could surmise otherwise from this document, for example, and therefore the issues that you need to address are questions of qualified immunity, whether a – let's take Cropps, for example. He wrote this letter. Somebody could look at the letter and think he was applying an irrebuttable presumption. So the question is if he's not going to be held in the case long enough to have a trial on it, there has to be some other reason. So what are those reasons? There are limitations for various reasons. You say a reason is because he wasn't responsible, but he signed this letter. So if he's not adamant, limitations, statute of limitations, I'm having a hard time seeing why the cause of action doesn't lie against him. Well, first of all, the – you want the – Well, I want to know why he should be dismissed from the lawsuit. Because his – your answer seems to be he wasn't really applying a rebuttable presumption, but that is a matter on which the facts are at least in conflict. Well, no, the facts are not in dispute about the circumstances of each one of these students. We deposed, and it's in the record, the depositions from each one of these students. Each one of these students described in detail where they were living, how long they had been living, here and there. What's the point of that? What's the point of that? That goes directly to the qualified immunity defense. Because the qualified immunity defense, the third prong, getting to the third prong, is whether or not an official could reasonably have believed they were acting consistently with law. Let me tell you that if – I'd like you to tell me why Mr. Gibson's suit against Mr. Croft should be dismissed, just to get it more specific. Because I can tell you that reading this letter, I would say that this was written as a generic letter. It doesn't seem to – it seems to make a statement that he is simply not going to look at the period of time in which he was enrolled for seven more semester credits. He's entitled to get up in a trial and disabuse me of that notion. But reading this letter, I think there's enough evidence to come to that conclusion. On that assumption, why should Mr. Croft be dismissed as a defendant? He should be dismissed on qualified immunity because the judge had the students' deposition. He had Croft's deposition. This is a summary judgment before a bench trial. There has been no request for a jury trial. So in those circumstances, certainly the judge, the prior effect, is able to – it's not inappropriate for him to draw inferences and to reach a conclusion about irrebuttable presumption or not. This student did not – it was reasonable for this school, Mr. Croft's, whoever made that decision, in this case Mr. Croft was part of the appeal chain, to judge this student as a non-resident. And that's true in every single one of those cases. If you look at those students, these are students that came from out of state and came just to go to school, admitted that they had come to the state to go to – That's what they say. Pardon? That's what you say, but that isn't what they say. They say we came here to stay. No. Some of them do. No. They said they came to go to school. They all admitted that, that they came to go to school. Some said we intended to stay on. But those kind of self-serving comments, courts have said schools are not obligated to take those at face value. You look at the student's situation. You don't look at their future – their stated future intent. If you did, everyone would be a resident. I mean, there would be no – you'd take, as in one case that I cited in the brief, you'd take residency out of the school's hands and put it in the hands of the students. What do you intend to do? Oh, I intend to stay here. And so that's not the standard that can be used and has been used. And frankly, let me – we argue this at the lower level. It wasn't rejected, but the courts didn't rely on it. It's implicit in the qualified immunity defense. The second prong is, was the right clearly established? Now, assuming the right here is that your residency status should be judged by something – the residency policy that you are judged by should not contain an irrebuttable presumption. That must be the right that they're asserting. That is not clear law at all. I mean, Vlandis v. Kline, everyone cites for that principle. But Vlandis v. Kline has been discredited. I mean, Weinberger v. Seligman. It has been limited, but it has not been overruled. But let me ask you a question. Is this the basis of what you want us to rule, or do you have any other defenses you'd like us to hear? Well, we've stated all our defenses in the brief. All right. That you want to argue today? No. I mean, I can tell you that to me you're on your weakest possible ground, so perhaps there are some other things you'd like to discuss. No. Well, let me address the continuing statute of limitations just briefly, the continuing violation, because both cases, both decisions cite either Knox v. Davis or Davis v. Knox, which is for the proposition that the initial wrong starts the clock running and resultant harm after that doesn't create a new violation. And I know Judge Schwarzer dissented in the Knox case. And both decisions stated the proposition right, but the facts in Knox are quite different. That was a case where a prison denied access to a lawyer, and that was the alleged wrong. And the lawyer then subsequently said, can I get in, can I get in, can I get in, and they kept saying no. And Judge Schwarzer said, well, no, these were all new in dissent, said these are new causes of action. Here you don't have that situation. A student is initially classified, as we heard, even they acknowledged the initial classification was correct. The policy says you should apply, you won't be reclassified unless you apply. And so when you register each year, there's no discretionary decision that is made at that time, as there was in turning down the attorney. It's just an automatic kind of thing. And section 19, certainly it's not intentional discrimination that section 1983 reaches. So clearly that's a continuing violation. And in the case, and when does it start? Like even in, even in. But the earlier opinion in this court said that there didn't have to be an application for there to be a victim, right? That's what they said. And they took exception with Matson, that Matson v. Boise State was applicable. And that's the law of the case in this case, right? Pardon? That's the law of the case in this case. Well, I argue that it shouldn't be because we have now found the facts clearly show that some students did exercise their right to appeal and were. Could you tell me where in the record that information is? Yes. There are two. It's in the affidavit. It's in both cases. The affidavit from the University of Montana registrar, Phil Bain. And there's also a letter from the commissioner of higher education that preceded Richard Croft's. But it was during the time that the first students in this group were in court or in school. And the one, the letter specifically says, well, you've been a full-time student, but you've overcome the presumption. It specifically says that. Phil Bain points out eight students from his one campus, and we're talking about a system that has six campuses, that eight students that he knew of that had overcome the presumption. And it's not that they made a mistake. That's an inaccurate characterization. He said they were classified as nonresidents, they were full-time students, and they reapplied and they were reclassified. There's nothing about a mistake in there. They had overcome the presumption. So there isn't any sort of futility involved here. One last point. And the basis of the decision, and this goes regardless of when the statute of limitations, regardless of qualified immunity, the 11th Amendment defense, I think, is an impenetrable barrier here for the damage claim. But it's against individual defendants. Well, that's what plaintiffs have now learned always to say. But as you know, starting with Ford Motor Company versus Indiana, where the person was after a tax refund, the court said it doesn't matter who you name, you look to the nature of the claim. And if they're trying to get the State Treasury to disgorge something, it's not allowed by the 11th Amendment. The best case that clarifies the claim is that the State Treasury is not allowed to disgorge something. What are they trying to do? Are they trying to get these individuals to pay them damages for their loss, for having to have ‑‑ excuse me, for having had to pay during the time period that they paid more than they would have had to otherwise? Exactly. That's exactly what they're trying to get. How did that reach the State Treasury? Well, they paid the money already. It's into the State Treasury. But the payback, as I understood it, the remedy they're seeking is for the individual defendants to pay them. No. That's what they said. But in their briefs, and be practical about it, they said we are trying to get the university system to disgorge, that's the term they used, disgorge the gain from this allegedly improper policy. Well, they're not going to be able to do that. Excuse me? They're not going to be able to do that, but they may be able to get damages from the individuals for their losses. But the money that the individuals paid was going into ‑‑ went into the Treasury. This is just like people paying taxes. I mean, it's no different from Ford Motor Company. Let's assume they got a judgment against ‑‑ things were reversed and they ended up with a judgment against Mr. Cropps, and he has to sell his house to pay it. I'm not saying that would happen, but let's say that happened. How does that reach into the Treasury? Well, how does ‑‑ The state doesn't automatically pay that. They're not asking for personal damages in the way of for the indignity suffered or the pain. No, they're asking for the damages of what they paid to the state. Yes. But they want to be compensated by the individuals. But Edelman v. Jordan addressed this point when they talked about Ford. And they said in Edelman ‑‑ they commented on Ford and said Edelman talked about you can't collect back welfare benefits. But then they went to Ford and they said, you know, Ford, that could have been looked at as a case of equitable restitution. Because these people had paid their taxes in, and their claim was, this really is our money, and all we're asking is our money back. And the court said, no, that money has gone into the state Treasury, and what they're asking for is their money back, what they paid in excess because of an incorrect tax law. That differs not a whit from this situation. My understanding of the difference is that in Edelman v. Jordan, for example, and I believe in Ford, but I'm not sure about this, they were attempting to characterize ‑‑ they were trying to take advantage of an ex parte young defense. They were suing people in their official capacity. They were not trying to undertake ‑‑ the difference being is that they were not trying to jump over a qualified immunity defense. They were suing people under ex parte young, and they were trying to characterize a ‑‑ what they were saying was an equitable award with regard to past benefits. And the court said you can't do that because it's really retroactive money. But there was no attempt to go after an individual on the grounds that they had violated clearly established law and should not have done as an individual what they did. Well, yes, I beg to disagree. I mean, in Edelman, they overturned specifically Shapiro v. Thompson. Yes, they did. You're looking ‑‑ pardon me. Shapiro v. Thompson, the merits was about something completely different. It was not about the merits of the Edelman v. Jordan question. No. Shapiro v. Thompson was a residency case. Right. And the welfare claimants came in and said we had been denied residence ‑‑ we had been denied welfare benefits because you had said we weren't a resident. And in Shapiro v. Thompson, they said, okay, you can get these back benefits because that was an improper residency qualification. They overruled that, specifically in Edelman, and said they shouldn't have done that. They should ‑‑ they might have gotten a ‑‑ under Ex parte Young, they might have gotten a future order, but they should not have gotten the benefits because they were trying to get them ‑‑ But they weren't trying to get it from Mr. Jordan in Edelman v. Jordan or from Mr. Thompson in Shapiro v. Thompson. But that's a pleading artifice that if that's the standard, anybody ‑‑ I'm sorry. Pardon me. I'm interrupting. I'm sorry. I don't see what's an artifice about it. I mean, they can win or they can lose, but it's not an artifice. I mean, we can say, you know, you can't get the money in these circumstances because there's qualified immunity, but why is it an artifice? Because you look at the nature of the ‑‑ of what they're asking for. And it's one thing to say I want a million dollars for pain and suffering. And the individual caused me that pain and suffering. But it's quite another to say I want a refund on my tuition. That's the difference. The remedies are of a different nature. And Edelman recognizes that? I'm sorry. Let's take an ordinary police brutality case. Somebody ‑‑ some policeman beat me up and I'm going to sue the policeman. And I want pain and suffering, but I also want my medical care and concrete economic damages. And suppose I first went to the police department, as I might have, and said, pay me my medical ‑‑ your policeman hurt me. You owe me some medical care. And they say no, we're not paying you. So they sue the policeman. Right? Now, they would have liked to get the money from the police department, but they didn't. And they're suing the individual who beat them up. And if they win, they're going to get damages, which is going to represent money, not just pain and suffering, but economic loss. And that's what they're trying to get here, economic loss. But I think it's economic loss, but what is the nature of that economic loss? And I'll just finish up. You missed the point completely. The question is whether a defendant is sued in the personal capacity or an official capacity. If the defendant is sued in the official capacity, the State becomes responsible. These defendants are sued in their personal response capacity, so they would respond to any judgment. So it doesn't affect the State. But that's not the case law. I don't think that's what Edelman said. And the Fifth Circuit, Jagnandan, clearly doesn't agree with that. I mean, I know that's not binding on you by any means. I'm sorry. I don't see where that's in Jagnandan either. Jagnandan, the main part of Jagnandan was about the suit against the State. And on personal liability, they didn't say you couldn't do it. They said that there was qualified immunity. But they were sued as individuals in Jagnandan. That's very, very clear. They were sued as both, and they discussed them as both. But so, well, I'm over my time. And it doesn't sound like I made much headway, but I hope I gave you something to think about. You never tell. You give us stuff to think about. Thank you. It's a very hard case, a lot of difficult issues. So we appreciate your presentation. Now, I guess we have a minute or two for rebuttal, but not more. We're going to have to stick to the time. Understood. Thank you. Starting with the proposition that you don't have to apply to be a victim, I think I was too quick to agree, Judge Schwartzer, with the notion that Mr. Gibson was denied when he first applied for reclassification. His decision to be denied never was official until that letter in January 23rd of 1999, and he shouldn't be punished where the rest of the students. In both of these cases, the lawsuits were brought within three years of the students attending. The students or the defense raises the 11th Amendment immunity, but, and I'm quoting, if defendant's analysis were adopted in every state in the union, if defendant's analysis were adopted in every state in the union, could it be denied its employees and thereby make federal enforcement of civil rights law impossible? There is a huge assumption being made here. The state does not have to reimburse these defendants. The state can choose to do that, and it doesn't necessarily do that. And one measure of damages can be how much money was unlawfully taken from them. It doesn't mean it's going to be, or necessarily that's the end of the question. The published writings I probably make too much ado about, but there is, this is summary judgment, and we were thrown out, number one, because the students were told the statute of limitations had run or they had no standing because they didn't apply what on its face is a futile application. And number two, they were thrown out because they were ultimately concluding that, well, the state will probably reimburse if you were successful on this, so the defendants are immune. You really want the money back. No, we want to stop the practice. That's not money at all. And stopping the practice by holding these defendants who engaged in it responsible will have waves, will have that effect. Might or might not, well, if that occurred. But it's not the same as an injunction. In any event, I appreciate your argument. We're going to have to bring this one to a close. Fascinating and difficult issues. Again, we really appreciate Montana Council coming across the mountains at such a long distance to visit. I appreciate both your arguments. So the case of DeAngelo versus Crofts and the case of Young versus Crofts shall each be submitted.
judges: Gould, Berzon, Schwarzer